THE GLOBE & RUTGERS FIRE INS. CO. *v.* THE BLUE RIDGE LUMBER CO.

(Decided November 16, 1928.)

*Messrs. De Camp, Sutphin & Brumleve,* for plaintiff in error.

*Messrs. Harmon, Colston, Goldsmith & Hoadly,* for defendant in error.

HAMILTON, P. J. The Blue Ridge Lumber Com-

pany, defendant in error, brought suit in the court of common pleas against the Globe & Rutgers Fire Insurance Company, plaintiff in error, on a policy of fire insurance. The insurance was to protect the lumber company against fire loss covering lumber on its property located at Rosedale, Tenn.

The record discloses that the lumber company had installed a mill on the property for the purpose of cutting out timber and reducing it to lumber; that it continued to saw out lumber until January, 1921, when the mill ceased to operate. The lumber sawed out was piled on the property of the lumber company. In June, 1921, the insurance policy in question was issued by the insurance company covering the lumber. The policy contained the following clause:

"Clear Space Clause.

"In consideration of the reduced rate and premium at which this policy is written, it is made a condition of this insurance that a continuous, unbroken, clear space of 100 feet shall be maintained at all times between the property herein described and any idle and/or operating and/or unused sawmill, planing mill and/or other wood working and/or manufacturing building or establishment and/or dry kiln and/or slab pit and/or refuse burner, and that said intervening clear space shall not be used for handling or piling of lumber of [or] lumber products therein or thereon for any purpose (tramways, upon which lumber is not piled, alone being excepted).

"This shall not be construed to prohibit loading or unloading within, or the transportation of lumber or

timber products across such clear space, between the hours of 6 A. M. and 6 P. M.

"This policy, however, shall not apply to or cover such timber, lumber or products thereof while being so transported or while in or on said clear space.

"The above stipulated clear space establishes the Yard Limits."

On February 25, 1922, a fire occurred destroying some of the lumber. The insurance company refused payment on the ground that the insured had violated, and was at the time of the fire violating the clear space clause provided for in the policy, thereby releasing it from liability thereunder. The lumber company thereupon brought suit on the policy and recovered the judgment which is sought to be reversed in this error proceeding.

The essential facts are not in dispute. That lumber was piled in the clear space in question is conceded. If there was any "idle and/or operating and/or unused sawmill" existing at the time of the fire, there was no liability under the policy.

The clear space clause in such insurance policies has been upheld many times, and a violation of the clause prevents recovery, unless it can be shown that there was a waiver of the clause by the insurance company. *Rife* v. *Lumber Underwriters* (C. C. A.), 204 F., 32. There is no evidence of a waiver or any act on the part of the insurance company estopping it from asserting the defense. When the insurance policy was written, the distance between the mill and the piled lumber was more than 100 feet. Later lumber was piled in this clear space, and this was the situation at the time of the fire.

Some courts have held that the violation of the

clause suspends the policy during the continuance of the violation. Other courts hold the policy voided absolutely by the breach. Which of these rules should be applied it is not necessary to determine here, since either suspension or voidability would prevent a recovery in this case.

In the last analysis the defense is solely that the sawmill had been abandoned at the time of the fire, and that there was, therefore, no idle or unused sawmill existing within 100 feet of the piled lumber. The case turns on this question of fact.

If there was no such idle or unused sawmill at the place in question at the time of the fire, then there was no violation of the clear space clause, notwithstanding lumber had been piled in what had formerly been the clear space. It is therefore necessary to turn to the evidence as shown by the record on this question.

The record discloses that the lumber company and the insurance company both considered in January, 1921, that a sawmill existed at the place in question, but had been shut down. In June, 1921, when the policy was written, it must have been considered that a sawmill existed, else there would have been no reason for the provision for the clear space clause. On the question as to the existence of an idle or unused sawmill at the time of the fire, we find in the record the following testimony of William W. Tarman, who was in charge of the lumber company at Rosedale, Tenn., given on direct examination by counsel for the lumber company:

"Q. State, if you know, whether or not this saw mill was shut down at the time of the fire? A. Yes, sir.

"Mr. Brumleve: That is conceded.

"Q. Will you state when it was shut down? A. Shut down some time early in January of 1921.

"Q. And will you state what was done, if anything, with the machinery at the time it was shut down? A. Dismantled the boiler and took off the water column. Took off the jet. Took off the injector. Took the governors off of the engine. The brasses out of the wrist.

"Mr. Brumleve: Not so fast.

"A. All right.

"Q. Is that what was done to the engine? A. That is what was done to the engine.

"Q. What were the governors for? A. Regulate the steam.

"Q. Can you run an engine without a governor? A. That controls the engine.

"Q. Can the engine be run without the governor? A. Yes, sir.

"Q. Can it be run properly? A. No, sir.

"Q. State whether or not—What is the jet? A. The jet is a little instrument we used at the river for pushing water up to the tank where we inject it into the boiler.

"Q. Had you any other means of applying water to that boiler through the line of which the jet was brought? A. No, sir.

"Q. You had an injector, you say, which was removed. What was that? A. That draws the water out of the tub or tank and forces it into the boiler.

"Q. Did you have any other means of getting water in that boiler while it was in operation than by this injector? A. None whatever.

"Q. Of course, the boiler wouldn't run without water, would it? A. Not likely.

"Q. What about this water column you talked about? A. That is a thing that has a glass which is hung on the front of the boiler, has glass gauges on it, you know, to show how much water is in the boiler and gauges how much steam you have in the boiler.

"Q. Yes. A. Water and steam.

"Q. You said also you removed the brasses from the wrist. What is that? Wrist? A. These brasses go around the wrist pin to keep it from getting hot.

"Q. I don't know that the jury understands what a wrist pin is? A. It is a pin that goes in the big cam or wheel, and this pin goes in there and the piston rod works back and forth on this pin.

"Q. For the purpose of reciprocating the engine, causing the wheel to turn around, is that it? A. Yes.

"Q. Now, what else did you say you took off the engine besides the brasses out of the wrist pin, the wrist, I should say? A. We took the governor.

"Q. Well, you have said that. A. That is all we took off.

"Q. Did you say something about taking the brass off of the slides? A. Took the brass out of the slides and out of the wrist.

"Q. What are these slides you talk about? A. That is where this thing works back and forth as a slide to keep it level, you see.

"Now, what if any use could be made of that engine and boiler? A. None, whatever.

"Q. In that condition, A. None.

"Q. What did you do with all of these parts, Mr. Tarman? A. We took that and the saw—

"Q. (Interrupting) Well, I will come to those later.

"Q. What did you do with those? A. We took them to Beech Fork.

"Q. Now, what else, if anything, did you take away from that mill at or about that time? A. Took the belts and the saws.

"Q. How many saws did you carry away? A. We carried away two large saws.

"Q. Do you know the sizes? A. One was sixty and the other fifty-six. No, one was fifty-six and sixty-six.

"Q. All right. Large circular saws? A. Yes, sir.

"Q. They did the main cutting work on the yard. Is that it? A. Yes, sir, they did all the cutting.

"Q. Well, you had two miter saws there? A. Had some miter saws and trimmer.

"Q. What are these edger saws?· A. Well, they are put in the frame and the board shoved through there to edge them and equalize them.

"Q. Cut off the edges? A. Cut off the edges.

"Q. Take the sap side off the rough edges? A. Yes.

"Q. How many of those did you have? A. Three.

"Q. You also had cut-off saw. Tell the jury what that is? A. That is for trimming the ends of the lumber and cutting it into equal lengths.

"Q. How many of those did you have? A. Two.

"Q. What if anything was done with these parts of the mill? A. Taken to Beech Fork.

"Q. How long did it stay there, Mr. Tarman? A. They stayed there until we sold the mill to Wes. Lowe.

"Q. Did you deal directly with Wesley Lowe in the transaction? A. No, I dealt with Mr. Potter.

"Q. You know Mr. Potter? A. Yes.

"Q. Do you know how you happened—A. (Interrupting) Wesley Lowe wanted the mill, but wouldn't talk to me and I had to deal through somebody else.

"Q. You had quite an extensive negotiation about the sale, did you? A. Yes, sir.

"Q. Did you conclude the deal? A. I did.

"Q. Were you the fellow that closed it? A. I did.

"Q. Will you tell the jury what you sold in that transaction? A. I sold a complete mill. That included these parts I took to Beech Fork.

"Q. What was done about the delivery of the parts that went to Beech Fork? A. I had them brought back to Rosedale.

"Q. Two loads did you say? A. To Rosedale.

"Q. Oh! I thought you said two loads. You had them brought to Rosedale. How were they brought back? A. In the wagon.

"Q. Much of a load or not? A. Made a pretty fair load.

"Q. And did you receive payment on behalf of the Blue Ridge Lumber Company for this mill? A. I did.

"Q. How much was it? A. $875.00.

"Q. Where was that paid to you? A. That was paid to me in Wes. Lowe's house by Mr. Potter.

"Q. What if anything was said between you and Mr. Potter and Mr. Lowe in respect to the whereabouts of the governor and slides?

"Mr. Brumleve: I object.

"Q. At the time of this transaction? A. Well, we talked—

"Mr. Brumleve (Interrupting): I object. (Question read.)

"Q. And other parts that had been removed?
"The Court: Sustain the objection.
"Mr. Kohl: Exception.
"Q. By whom were these parts brought back to Rosedale? By you or by Mr. Potter or by Mr. Lowe or by somebody employed by either of them? A. I sent them back by a fellow who worked for the Blue Ridge Lumber Company by the name of John Bennett.
"Q. You paid him for his services? A. Paid him for his time.
"Q. That is the Blue Ridge Lumber Company? A. Yes, sir."

With some reiterations later in the record, this constitutes the whole of the evidence as to whether or not there was an idle or unused sawmill at the place in question. Under this evidence and under the charge of the court, the jury of necessity must have found that there was no idle or unused saw-mill as claimed. We are of opinion that in so finding the jury was in error. While some of the removable parts of the machinery had been taken away for safety, this did not remove the fire hazard necessarily contemplated by the parties when the insurance was written. All the fire hazard of an idle, unused sawmill was present. The removal of the parts as testified to was entirely consistent with the fact that there still existed an idle, unused sawmill.

It would serve no purpose to argue these undisputed facts. Our conclusion is that there existed an idle, unused sawmill at the place in question, and that the lumber company violated the clear space clause. The trial court should therefore have sustained the motion of the defendant for an instructed verdict made at the close of the evidence.

For error in overruling the motion of defendant for an instructed verdict, the judgment of the court of common pleas will be reversed, and final judgment will be entered here in favor of the plaintiff in error.

*Judgment reversed, and judgment for plaintiff in error.*

MILLS and CUSHING, JJ., concur.